UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                         :

MAURICIO ORBETTA, DELROY HARRIOT, and      :
GOSNELL BUTLER, individually and on behalf of all   :
others similarly situated,                  :
                         :             20 Civ. 9000 (JPC)
             Plaintiffs,      :
                         :         OPINION AND ORDER
       -v-                  :
                         :
DAIRYLAND USA CORPORATION, THE CHEF'S     :
WAREHOUSE, INC.,                :
                         :
            Defendants.     :
                         :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiffs Mauricio Orbetta, Delroy Harriot, and Gosnell Butler, on behalf of themselves

and all others similarly situated, including fifty individuals who have opted into this action

pursuant to 29 U.S.C. § 216(b) (collectively, "Plaintiffs"), bring this putative collective and class

action seeking unpaid overtime compensation, statutory damages, and other relief from Dairyland

USA Corporation ("Dairyland") and its parent company, The Chef's Warehouse, Inc. ("TCW")

(together, "Defendants"). Plaintiffs assert six causes of action. The First and Second Causes of

Action allege that Defendants failed to pay minimum wages in violation of the Fair Labor

Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, and in violation of the New York Labor Law

("NYLL"), respectively. Dkt. 68 ("Am. Compl.") ¶¶ 86-99. The Third and Fourth Causes of

Action allege that Defendants failed to pay overtime wages in violation of the FLSA and the

NYLL, respectively. *Id.* ¶¶ 100-110. The Fifth Cause of Action claims that Defendants failed to

provide Plaintiffs with wage notices when they were hired in violation of NYLL section 195(1).

*Id.* ¶¶ 111-113. And the Sixth Cause of Action alleges that Defendants failed to provide Plaintiffs

with wage statements in violation of NYLL section 195(3). *Id.* ¶¶ 114-116.

Plaintiffs and Defendants have both moved for summary judgment. Defendants seek summary judgment on Plaintiffs' Third Cause of Action on the ground that Defendants were exempt from paying overtime wages otherwise due under the FLSA pursuant to the Motor Carrier Act ("MCA") exemption to the FLSA. *See* 29 U.S.C. § 213(b)(1). Defendants have also moved for summary judgment on Plaintiffs' Fifth and Sixth Causes of Action on standing grounds. Plaintiffs oppose Defendants' motion and have also cross-moved for partial summary judgment, seeking a finding that the MCA exemption does not apply in this case. Plaintiffs also seek leave to move for collective certification under the FLSA and for class certification as to their NYLL claims.

Defendants have failed to carry their burden to establish that TCW qualifies for the MCA exemption. As to Dairyland, there are no disputes of material fact as to ten Plaintiffs who regularly drove interstate routes. For those Plaintiffs, the MCA exemption applies and they cannot prevail on their claims against Dairyland under the FLSA's overtime provision. Genuine disputes of material fact do exist, however, as to whether the MCA exemption applies to the other Plaintiffs. Accordingly, Defendants' motion for summary judgment as to Plaintiffs' FLSA overtime claim is granted in part and denied in part, while Plaintiffs' cross-motion for summary judgment is denied. Defendants' motion for summary judgment on Plaintiffs' Fifth and Sixth Causes of Action is denied without prejudice to renewal following full discovery. Likewise, Plaintiffs' request for permission to move for collective certification and class certification is denied without prejudice as premature for similar reasons.

## I.      Background

### A.      Facts[1]

The Chef's Warehouse, Inc. ("TCW") is a publicly traded company that distributes specialty food products throughout the United States.  Pls. Counter 56.1 Stmt. ¶¶ 1-2.  TCW's customers are "chefs who own and operate restaurants, [] fine dining establishments, country clubs, hotels, caterers, culinary schools, and specialty food stores."  *Id.* ¶ 2.  Dairyland is a wholly-owned subsidiary of TCW and, like its parent company, a food distribution company.  Defts. Counter 56.1 Stmt. ¶¶ 1, 3.  To that end, Dairyland operates a distribution warehouse (the "Warehouse") located at 240 Food Center Drive in the Bronx, New York.  *Id.* ¶ 4.  The Warehouse is an import hub for TCW's products, and Dairyland employs truck drivers to deliver products stored at the Warehouse to customer locations across the northeastern United States.  Pls. Counter 56.1 Stmt. ¶¶ 4, 10.  The Warehouse also stores goods to be distributed to other TCW distribution centers throughout the United States.  *Id.* ¶ 11.

Dairyland's truck drivers are categorized into three groups based on the type of driver's license held, the type of vehicles operated, and the region covered:

---

[1] The following facts are primarily drawn from the parties' statements of material facts pursuant to Local Civil Rule 56.1, Dkts. 123 ("Defts. 56.1 Stmt."), 131 ("Pls. Counter 56.1 Stmt."), 138, 145 ("Defts. Counter 56.1 Stmt."), and the declarations, including the exhibits attached thereto, filed by the parties.  *See* Dkts. 125-126, 133-137, 144.  Unless otherwise noted, the Court cites only to a party's counter-Rule 56.1 statement when the parties do not dispute the fact, the adverse party has offered no admissible evidence to refute that fact, or the adverse party simply seeks to add its own "spin" on the fact or otherwise dispute the inferences from the stated fact. The Court disregards any factual assertions in the parties' briefing that lack a citation to supporting evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A).

| Type of Driver's License | Type of Vehicle | Covered Area |
|---|---|---|
| Class-A commercial driver's license ("CDL A") | Tractor trailers | Long distance |
| Class-B commercial driver's license ("CDL B") | Refrigerated delivery trucks | Northeastearn U.S. |
| Non-commercial driver's license | Non-commercial delivery trucks | Local deliveries |

Defts. Counter 56.1 Stmt. ¶ 6.  Drivers with CDL A licenses deliver either to Dairyland's customers or to other TCW distribution centers.  Dkt. 126-1 ("Dairyland Dep. Tr.")[2] at 39:5-9. Drivers with CDL B licenses are limited to delivering to Dairyland's customers.  *Id.* at 39:10-12. Drivers with non-commercial licenses also appear to only make deliveries to Dairyland's customers.  *Id.* at 34:15-23.  Although the parties did not provide evidence of the types of driver's license held by each Plaintiff, Plaintiffs represent that this lawsuit concerns drivers in the second and third categories.  *See* Dkt. 132 at 4.

The record contains conflicting evidence on the process by which Dairyland decided what products to purchase and ship to the Warehouse, namely whether Dairyland ordered shipments to the Warehouse based on prior specific orders from its customers or based on demand forecasting. At Defendants' Federal Rule of Civil Procedure 30(b)(6) deposition, their corporate representative, Gifford, provided somewhat shifting testimony when asked about this aspect of Dairyland's operations.  First, he testified:

Q:     [I]s all the inventory Dairyland purchases based on a forecast?

A:     Yes.  Yes.  It's not necessarily a forecast of this is what we'll need next
       week.  Again, it depends on how fast it spoils, how long we can keep it for
       and, you know, even a little bit of, hey, we got a good deal on this and it
       will keep so we'll bring it in, we know we'll get -- we'll sell it eventually.
       But broadly, yes.

---

[2] Citations to "Dairyland Dep. Tr." are to the transcript of the April 27, 2022 deposition of Stephen Gifford, who testified as a corporate representative of both TCW and Dairyland. Dairyland Dep. Tr. at 8:2-10, 4:17-24; *see* Fed. R. Civ. P. 30(b)(6).

Dairyland Dep. Tr. at 72:8-16.  But then, later in the deposition, Gifford testified:

> Q:    So just going back to the forecasting, is it possible that Dairyland will buy inventory based on an individual order from a customer?
>
> A:    It is.
>
> Q:    Okay.  Can you explain the circumstances under which that would occur[?]
>
> A:    So it would be either a particularly good customer we didn't want to say no to, or it would be a customer who's committed to buying a large enough amount that it would make sense to order it and hold -- you know, hold it in the warehouse.  Or, I guess, a third one: It would be a product where even if only one customer wanted it we were confident that we could sell it to other customers.
>
> Q:    So generally, it would have to become a -- if the customer did put in a particular order that was not in the catalog, then it would have to become a product that would become part of the catalog and available to other customers unless you were doing a particular, quote/unquote, favor for a favored customer?
>
> A:    So broadly, yes.  There are -- I'm not sure Dairyland has had the experience. I know that we've had the experience in other -- in other companies where we became the logistics provider for something that was proprietary to the restaurant group or the -- the customer.  In which case, we wouldn't have it available to everyone else.  That's the exception, not the rule, and I'm not sure if that's happened -- happened in Dairyland or not.
>
> Q:    Okay.  So was what I just asked earlier an accurate or a fair assessment?
>
> A:    Broad -- broadly correct, yes.
>
> Q:    Okay.  How often have they done favors -- how often has Dairyland done that, like, purchased a product as a favor for, like, a favored customer?
>
> A:    I don't have a good sense of that, and I'm not even sure we have that quantified anywhere.

*Id.* at 80:7-81:20.  Relatedly, Gifford also described the interplay between Dairyland's purchasing

department and its sales department:

> So the purchasing department needs to be able to forecast what we need so that we don't have product out of stock.  That's a -- you know, that's a process where they're looking at sales data but also speaking with the sales representatives and sales leadership, say, you know, especially if there's major changes coming.  So New York is lifting its mask mandates, you know, opening up; Connecticut's

country clubs are opening back up, things like that, where the forecast for product
coming in might be changing.  That's something that would be a conversation
between purchasing and sales.  We also will, on a fairly regular basis, get customers
who want a specific item that's not in our catalog.  So that is sales going back to
purchasing and saying, hey, can we get this.  And then that's a -- that's a kind of
balance that purchasing makes of if we bring this product into our warehouse will
we find other customers for it.  You don't want to have product going out to one
customer.  It's just not going to move very fast.  Or, alternatively, do we have some
other product in our catalog that might be able to fill that chef's requirement.  If --
if a chef feels really strongly about it, what do you think the -- the amount that's
going to be ordered is going to be.  So that's some of interplay between the two
functions.

*Id.* at 40:6-41:10; *see also id.* at 41:11-43:20 (providing further detail).

Christopher Heffelfinger, Vice President of Northeast Regional Operations for TCW and

its subsidiaries, and Gifford, Vice President of Human Resources for TCW and its subsidiaries,[3]

both submitted Declarations that discussed nature of Dairyland's ordering process.  Dkt. 144

("Heffelfinger Decl."); Dkt. 125 ("Gifford Decl.").  Heffelfinger states:

Many of the goods and produce that are being imported into Dairyland's Bronx
warehouse are earmarked for specific TCW customers.  As a general rule, the
goods, many of which are perishable, only remain in the Bronx warehouse for a
very limited period of time until they are shipped to their final destination.  Indeed,
many of the goods that are temporarily stored in the Bronx Warehouse are
earmarked for specific customers who ordered, or expressed an interest in ordering
the particular item[.]

Defendants also use sophisticated projection systems to assess the needs of their
customers.  Goods and products are purchased based on these projection systems.

Heffelfinger Decl. ¶¶ 7-8.  And Gifford states that

A very large portion of the goods and produce that are being imported into
Dairyland's Bronx warehouse, are earmarked for specific TCW customers.  As a
general rule, the goods, many of which are perishable, only remain in the Bronx
warehouse for a very limited period of time until they are shipped to their final

---

[3] In his Declaration, Gifford states that he is "the Vice President of Human Resources for
the Chef's Warehouse, and its subsidiaries."  Gifford Decl. ¶ 2.  At the Rule 30(b)(6) deposition,
Gifford testified that he is the "Vice [P]resident of Human Resources" and is "directly employed
by Dairyland USA," which is one of "a number of business units" under TCW.  Dairyland Dep.
Tr. at 8:6-19.  To the extent there is any daylight between Gifford's two descriptions of his title
and which entity—the parent, TCW, or the subsidiary, Dairyland—is his direct employer, that is
immaterial to the Court's resolution of the pending motions.

destination.  Indeed, much of the goods that are temporarily stored in the Bronx Warehouse are earmarked for specific customers who ordered, or expressed an interest in ordering the particular item.  To that end, TCW's customers are almost always identified in advance, as are TCW's customers' needs.

Gifford Decl. ¶ 7.

Once products arrive at the Warehouse, Dairyland assumes ownership of the products and Dairyland's truck drivers deliver the merchandise to Dairyland's customers, Gifford Decl. ¶ 8; Dairyland Dep. Tr. 48:23-49:15, and collect payments or obtain receipt for goods delivered, *id.* ¶ 10.  There is conflicting evidence on whether the drivers also performed other tasks.  Gifford testified at the Rule 30(b)(6) deposition that the drivers do not also "pick up an order . . . from a supplier and bring it back to the warehouse."  Dairyland Dep. Tr. at 35:19-24.  Heffelfinger, however, states in his declaration that drivers are "often asked" to "return crates[] to suppliers who ship goods to the Bronx warehouse" and that it is "not uncommon for drivers to be asked to drive interstate routes that are outside of their normally scheduled route to pick up products and goods directly from the supplier and bring those goods to the Bronx warehouse."  Heffelfinger Decl. ¶¶ 14-15.

Between 2017 and 2021, Dairyland drivers departing from the Warehouse collectively drove approximately ninety different routes each year, around half of which were destined for locations outside New York State.  Pls. Counter 56.1 Stmt. ¶¶ 14-28.  The routes included destinations in Massachusetts, New Jersey, Pennsylvania, Connecticut, and Rhode Island.  *Id.* ¶¶ 14-28.  The company typically assigned drivers to a particular route, and some routes entailed the driver making stops solely within New York State.  Defts. Counter 56.1 Stmt. ¶ 14; *accord id.* ¶¶ 12-13.  The following drivers—who have all opted into this action by filing a Consent to Become a Party Plaintiff pursuant to 29 U.S.C. § 216(b)—"regularly deliver[ed] stock to businesses outside of New York State": Jamie Perez, Jose Sanchez, Isaac Pyant, Francis Cabrera, Martin Haye, Robert Jimenez Ramos, Ramon Ramos, Alexandro Palalia, Alejandro Palalia, and

Juan Vasquez.  Pls. Counter 56.1 Stmt. ¶¶ 29-38; Dkts. 7, 11, 51, 15, 37, 8, 50, 23, 40, 28.[4]  The parties do not point the Court to direct evidence on the routes any other specific drivers, including the other Plaintiffs, regularly drove.[5]  *See* Defts. Counter 56.1 Stmt. ¶¶ 14-16.  It is undisputed, however, that "not every driver necessarily has driven out of [New York] state."  *Id.* ¶ 24.

There is conflicting evidence on whether all drivers ever might have been asked to drive an interstate route.  Gifford, as Dairyland's corporate representative, testified that normally intrastate drivers could very well be asked to cover interstate routes:

> Q:  So are there individual delivery drivers who do delivery routes that do not leave the state of New York?
>
> A:  So on a given day, absolutely, over the course of months or years, not necessarily.  The -- we certainly have a number of routes that, you know, go through a specific borough, go through Westchester, go through Long Island.  But over the course of time -- it's a little -- it's similar to what we were talking about earlier . . . .
>
> When somebody calls out, when somebody's training, when somebody doing a safety ride, when somebody's just covering for somebody else, you know, they -- there's potential for, you know, taking a different route that's

----

[4] It is not clear whether Alexandro Palalia and Alejandro Palalia are the same person.  A different opt-in was filed for each.  *See* Dkts. 23 (Alexandro Palalia), 40 (Alejandro Palalia).  Defendants' reply brief states that "at least nine of the Opt-in Plaintiffs were typically assigned out of state routes," but counting both Alexandro Palalia and Alejandro Palalia would mean that ten Plaintiffs were typically assigned out of state routes.  *See* Dkt. 143 ("Defts. Reply.") at 2.  In listing the names of the opt-in Plaintiffs that regularly drove outside New York State in their lead brief, Defendants only include Alexandro Palalia.  Dkt. 124 at 13.  As a separate opt-in was filed under each name and Plaintiffs did not dispute the inclusion of both names in Defendants' Rule 56.1 Statement, *see* Pls. Counter 56.1 Stmt. ¶¶ 29-38, for purposes of this motion the Court assumes that there are two different individuals: Alejandro Palalia and Alexandro Palalia.

[5] Defendants filed, as exhibits to their Rule 56.1 statement, a series of PDF files that appear to list routes driven each day for 2017 to 2020.  Dkts. 125-2, 125-3, 125-4, 125-5.  Defendants do not provide any context for these files.  They offer no testimony explaining, for instance, whether these are complete records of routes for the named drivers.  Nor do Defendants present any factual assertions as to the frequency of non-New York routes based on these files.  In the absence of any explanation or context for these exhibits, the Court does not consider them in deciding the parties' motions.  *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000) ("While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.").

going to take you through Connecticut or take you through New Jersey.
Dairyland Dep. Tr. at 51:20-52:12; *see also id.* at 58:4-59:12 (testifying that his prior testimony about the possibility of a driver assigned to intrastate deliveries also making interstate deliveries was speculation based on his general assumptions and that he had not seen any documentation verifying that occurrence). Gifford also testified that drivers with CDL B licenses may "from time to time" operate local delivery trucks because "on any given day, any given morning, you might have people calling out. You might have people -- you might have trucks breaking down. You might have shorter delivery routes . . . it's bound to happen." *Id.* at 39:15-23. Heffelfinger and Gifford each similarly noted in their Declarations that "Dairyland drivers are expected to cover other drivers when they are unavailable to drive for their shifts. This coverage responsibility means that every single one of Dairyland's drivers have [sic] the potential of covering an interstate route on a given day." Heffelfinger Decl. ¶ 12; Gifford Decl. ¶ 12.

The union representative for the drivers at the Warehouse, however, submitted a Declaration stating that Dairyland does not use random route assignment. Dkt. 134 ("Wiley Decl.") ¶¶ 12-13. Two of the Plaintiff drivers similarly submitted Declarations stating that there are "not random route assignments" and that they do not "expect to be placed on a truck or route that is outside [their] normal territory." Dkt. 135 ("Harriot Decl.") ¶¶ 11, 13; Dkt. 136 ("Butler Decl.") ¶¶ 11, 13. Those two drivers also acknowledge that they traveled out of state for deliveries at the start of the COVID-19 pandemic, but both maintain that this was rare and they "almost never" left New York state for deliveries. Harriot Decl. ¶ 15; Butler Decl. ¶ 15. And a third driver states in his Declaration that "[i]n [his] entire time working for the Defendants, [he] did not deliver outside of New York State." Dkt. 137 ("Velez Decl.") ¶ 9.

**B.    Procedural History**

On October 27, 2020, Orbetta filed the initial Complaint. Dkt. 1. From October 27, 2020

through January 25, 2021, fifty individuals opted into this case as additional Plaintiffs under 29 U.S.C. § 216(b). Dkts. 6-40, 43-45, 48-61, 130. On February 2, 2021, Plaintiffs filed an Amended Complaint, adding Harriot and Butler as named Plaintiffs. Dkt. 68. In the Amended Complaint, Plaintiffs assert their FLSA claims as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of all Dairyland's delivery drivers working at the Warehouse in the three years preceding the Amended Complaint and press their New York state law claims as putative class action claims pursuant to Federal Rule of Civil Procedure 23 on behalf of all Dairyland delivery drivers who worked at the Warehouse in the preceding six years. *Id.* ¶¶ 14, 16, 67-85.

At a telephone conference held on June 22, 2021, the Court ordered, with the parties' agreement, that discovery initially be limited to the question of the application of the MCA exemption to the FLSA, 29 U.S.C. § 213(b)(1). *See* June 22, 2021 Minute Entry; *see also* Dkt. 94. On July 21, 2021, the parties submitted a proposed case management plan, which stipulated that the proposed "discovery schedule [was] solely related to information concerning the application of the Motor Carrier Act. Upon completion, the parties agree[d] to stay further discovery until any contemplated motion practice [was] completed." Dkt. 95. On July 23, 2021, the Court entered the parties' proposed case management plan. Dkt. 96.

On November 18, 2022, Defendants moved for summary judgment, seeking judgment in their favor on the Third Cause of Action for their alleged failure to pay overtime wages in violation of the FLSA on the ground that Defendants are exempt from FLSA overtime requirements under the MCA exemption. Dkts. 122-23, 124 ("Defts. Mot."). Defendants also asked for judgment in their favor on Plaintiffs' fifth and sixth causes of action—for failure to provide wage notices and failure to provide wage statements in violation of NYLL sections 195(1) and 195(3), respectively—on the ground that Plaintiffs lack standing to bring those claims. Defts. Mot. at 18-20. On January 4, 2023, Plaintiffs opposed Defendants' motion and cross-moved for summary

judgment, seeking a ruling that, as a matter of law, the MCA exemption does not preclude their claims for unpaid overtime under the FLSA.  Dkts. 131, 132 ("Pls. Opp. & Cross-Mot.").[6]  On February 28, 2023, Defendants opposed Plaintiffs' cross-motion, Dkt. 146 ("Defts. Opp."), and replied to Plaintiffs' opposition to Defendants' motion, Dkt. 143.  Finally, on March 14, 2023, Plaintiffs replied to Defendants' opposition to Plaintiffs' cross-motion. Dkt. 147 ("Pls. Reply").

## II.     Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a "material" fact is one that "might affect the outcome of the suit under the governing law."  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).   In making this determination, the court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* at 322.  "If the moving party meets it initial burden, the nonmoving party must then 'set forth specific facts

---

[6] In their brief opposing Defendants' motion and cross-moving for summary judgment, Plaintiffs request that the Court "[g]rant Plaintiff's [sic] summary judgment on the issue that Defendants cannot apply a blanket [MCA] exemption to the delivery drivers at the" Warehouse. Pls. Opp. & Cross-Motion at 2.  The Court construes Plaintiffs' motion as asking the Court to find that the MCA exemption does not, as a matter of law, apply to Plaintiffs.

showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings." *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248); *Jeffreys v. The City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). At the same time, however, "in considering 'what may reasonably be inferred' from witness testimony, the court should not accord the nonmoving party the benefit of 'unreasonable inferences, or inferences at war with undisputed facts.'" *Taylor*, 2022 WL 744037, at *7.

The Court "need not enter judgment for either party" when cross-motions for summary judgment are filed. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Generally, the Court evaluates each cross-motion independently of the other, considering the facts in the light most favorable to the non-moving party. *Id.* "But where, as here, the motion and cross-motion seek a determination of the same issues, the Court may consider them together." *ExteNet Sys., Inc. v. Vill. of Pelham*, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019). In reviewing the parties' cross-motions, the Court "has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion" but "it is not required to consider what the parties fail to point out." *Monahan*, 214 F.3d at 292.

### III.   Discussion

### A.   The FLSA and the MCA Exemption

Section 207 of the FLSA contains the statute's "[m]aximum hours" provisions and requires employers to pay overtime wages "at a rate not less than one and one-half times the [employee's] regular rate" for a working period exceeding forty hours in any work week.  29 U.S.C. § 207(a).  Section 213, in turn, provides various exemptions to the statute, including, as relevant here, the MCA exemption to Section 207.  *See* 29 U.S.C. § 213(b)(1).  Under the MCA exemption, Section 207(a)'s overtime pay requirements do not apply to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of [T]itle 49."  *Id.*  The scope of the Secretary of Transportation's "power to establish qualifications and maximum hours of service" is set by the MCA, under which the "Secretary of Transportation may prescribe requirements for . . . qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation."  49 U.S.C. § 31502(b)(2).

The MCA defines a "motor private carrier" as

a person, other than a motor carrier,[7] transporting property by motor vehicle when—

    (A) the transportation is as provided in section 13501 of [Title 49];

    (B) the person is the owner, lessee, or bailee of the property being transported; and

    (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

*Id.* at § 13102(15).  Transportation falls within Section 13501 if passengers or property are transported

---

[7] The MCA defines "motor carrier" as "a person providing motor vehicle transportation for compensation."  49 U.S.C. § 13102(14).

(1) between a place in—

    (A) a State and a place in another State;

    (B) A State and another place in the same State through another State;

49 U.S.C. § 13501.

Taken together, these provisions impose three requirements.  First, the employer must be a "motor private carrier"—meaning, "a person, other than a motor carrier, transporting property by motor vehicle" as either the owner, lessee, or bailee of that property, and that property must be being "transported for sale, lease, rent, or bailment or to further a commercial enterprise."  49 U.S.C. § 13102(15); *see also Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 222 (2d Cir. 2002).  Second, the employees must "engage in activities of a character directly affecting the safety of operation of motor vehicles."  29 C.F.R. § 782.2(a); *accord Levinson v. Spector Motor Serv.*, 330 U.S. 649, 685 (1947); 49 U.S.C. § 31502(b)(2).  There is no dispute that the activities of truck drivers, such as Plaintiffs, directly affect the safety of motor vehicle operation.  *See* Defts. Mot. at 11-12; Pls. Opp. & Cross-Mot. at 7-18; Pls. Reply at 2-7.[8]  Finally, the activities of the employees must involve transporting property "between a place in . . . a State and a place in another State."  49 U.S.C. § 13501(1).  In other words, for the exemption to apply, the drivers' duties must involve transportation "in interstate commerce for the purposes of the MCA."  *Raymond v. Mid-Bronx Haulage Corp.*, No. 15 Civ. 5803 (RJS), 2017 WL 1251137, at *4 (S.D.N.Y. Mar. 31, 2017).  The parties dispute whether the duties of Plaintiffs, who Plaintiffs' briefing represents are CDL B and local delivery drivers, Pls. Opp. & Cross-Mot. at 4, fall within in this range of activity.

In assessing whether the MCA exemption applies, a court must give the exemption a "fair

---

[8] Unsurprisingly, it is well established that the activities of drivers affect the safety of operation of motor vehicles.  *Levinson*, 330 U.S. at 673; *Williams v. Tri-State Biodiesel, L.L.C.*, No. 13 Civ. 5041 (GWG), 2015 WL 305362, at *5-6 (S.D.N.Y. Jan. 23, 2015); *Dauphin v. Chestnut Ridge Transp., Inc.*, 544 F. Supp. 2d 266, 274 (S.D.N.Y. 2008).

reading." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *Simmons v. Trans Express Inc.*, 16 F.4th 357, 362-63 (2d Cir. 2021); *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 128-29 (2d Cir. 2020).[9] "It is the employer that bears the burden to establish the applicability of an exemption under the FLSA." *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 227 (2d Cir. 2018).[10]

---

[9] Until *Encino Motorcars*, courts in this Circuit construed FLSA exemptions narrowly against the employers seeking to assert them. *See, e.g.*, *Pippins v. KPMG, LLP*, 759 F.3d 235, 238 (2d Cir. 2014); *Bilyou*, 300 F.3d at 222. The Supreme Court in *Encino Motorcars* rejected this approach, explaining that it "relies on the flawed premise that the FLSA pursues its remedial purpose at all costs." *Encino Motorcars*, 138 S. Ct. at 1142 (internal quotations and citations omitted). Rather, the Court explained, FLSA "exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement," and thus courts "have no license to give [an] exemption anything but a fair reading." *Id.* Much of the caselaw in this District interpreting the MCA exemption was decided prior to *Encino Motorcars*. *E.g.*, *Bilyou*, 300 F.3d at 222; *Dauphin*, 544 F. Supp. 2d at 271-72. The Court is cognizant of the clarification of the applicable standard of review occasioned by *Encino Motorcars*, and accordingly has discounted as appropriate the weight afforded to decisions that preceded *Encino Motorcars* and applied a narrow construction standard, to account for the greater solicitude defendant employers receive when invoking exemptions to the FLSA.

[10] In 2008, Congress passed the SAFETEA-LU Technical Corrections Act of 2008 ("TCA"), Pub. L. No. 110–244, § 306(a)-(c), 122 Stat. 1572 (June 6, 2008). Section 306 of the TCA, titled "Applicability of Fair Labor Standards Act Requirements and Limitation on Liability," provides that the overtime requirements of Section 207 of FLSA apply notwithstanding the MCA exemption if the employee's "work, in whole or in part" affects "the safety of operation of motor vehicles weighing 10,000 pounds or less" and involves "perform[ing] duties on" such smaller vehicles. TCA, 122 Stat. at 1621, *codified at* 29 U.S.C. § 207 (Statutory Notes and Related Subsidiaries: Applicability; Liability of Employers). The Second Circuit has yet to explore the TCA. The statutory text does not express which party bears the burden of proof for establishing the weight of the at-issue vehicles. This Court agrees with the Fifth Circuit in holding that a plaintiff employee must establish that the MCA exemption does not apply on account of the TCA. *See Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 579-80 (5th Cir. 2018); *accord Rychorcewicz v. Welltec, Inc.*, 768 Fed. App'x 252, 256-57 (5th Cir. 2019); *Gonzalez v. Dom's Lawnmaker, Inc.*, No. 17 Civ. 3519 (JMA), 2022 WL 17488524, at *6 n.3 (E.D.N.Y. Dec. 7, 2022). The TCA is codified under Section 207, which contains FLSA's overtime provisions and lays out what a plaintiff employee must establish to prevail under the provision. Notably, the TCA does not appear under Section 213 which contains exemptions, like the MCA exemption itself, for which the defendant employer bears the burden. Nor is the TCA otherwise described as an exemption to the FLSA. Thus, the TCA is best understood as a vehicle-weight exception to the MCA exemption, and a plaintiff must establish that exception if the MCA otherwise applies. Plaintiffs here have not argued that they are excepted from the MCA exemption by virtue of the TCA.

### 1.  Motor Private Carrier

It is beyond dispute that Dairyland qualifies as a motor private carrier under the MCA.  *See* Defts. Mot. at 11-12; Pls. Opp. & Cross Mot. at 7-18; Pls. Reply at 2-7.  As Gifford testified, Dairyland is the owner of the food products once they arrive in the Warehouse, and it employs drivers to transport that property for sale to customers.  Dairyland Dep. Tr. at 48:23-49:11; Pls. Counter 56.1 Stmt. ¶ 4.  In contrast, the record is bereft of concrete evidence about TCW's ownership *vel non* of the food products: Gifford, who appears to have been the only witness deposed and testified as the corporate representative for both TCW and Dairyland, *see* Dairyland Dep. Tr. at 4:17-24, was unable to describe the relationship between the two entities:

> A:    Dairyland is a subsidiary of Chef's Warehouse Incorporated, one of several.
>
> Q:    Is there a – can you describe the interaction between the two.
>
> A:    I can't.

*Id.* at 17:18-22.  The parties Rule 56.1 statements shed no further light, leaving the Court unable to conclude, as a matter of law, that TCW owns any of the products shipped to the Warehouse for purposes of qualifying for the MCA exemption.  In fact, Defendants have not argued that TCW is a motor private carrier.  And, as noted, it is their burden to establish that an exemption to the FLSA applies.  Accordingly, the Court cannot conclude, as a matter of law, that TCW is a motor private carrier and Defendants' motion must therefore be denied as to TCW at this time.

As to Plaintiffs' cross-motion, Plaintiffs have presented no undisputed facts that allow for the conclusion that TCW, as a matter of law, does not qualify as a motor private carrier.  In fact, Plaintiffs do not even argue that they are entitled to summary judgment in their favor as to TCW based on TCW's inability to meet this element.

Since Dairyland qualifies as a motor private carrier, and the undisputed evidence does not show that TCW fails to qualify as one, the Court proceeds to assess whether Plaintiffs were

operating in interstate commerce for purposes of both Defendants' motion seeking application of the MCA exemption as to Dairyland and Plaintiffs' cross-motion seeking to preclude application of the exemption as to TCW and Dairyland.

### 2. Plaintiffs that Drive Interstate Routes

The parties agree that ten Plaintiffs are drivers who "regularly delivered stock to businesses outside of New York State." Pls. Counter 56.1 Stmt. ¶¶ 29-38. They are: Jamie Perez, Jose Sanchez, Alexandro Palalia, Isaac Pyant, Francis Cabrera, Martin Haye, Robert Jimenez Ramos, Ramon Ramos, Alejandro Palalia, and Juan Vasquez. *Id.* Drivers who regularly deliver goods across state lines engage in interstate commerce, as Plaintiffs appear to concede. *See* 49 U.S.C. § 13501; Pls. Opp. & Cross-Mot. at 13 ("Plaintiffs do not argue that *all* drivers are not FMCA exempt. Clearly, some drivers do travel interstate."). Thus, as to these ten Plaintiffs, the Court grants summary judgment in favor of Dairyland and denies Plaintiffs' cross-motion, finding that the MCA exemption applies to them and therefore they do not fall under the FLSA's overtime pay provision. *See Goldberg v. Faber Indus., Inc.*, 291 F.2d 232, 234 (7th Cir. 1961) (finding that the MCA exemption applied as to five out of twenty drivers where the uncontroverted evidence showed that those five drivers were assigned to interstate routes).

As to the remaining Plaintiffs, while Defendants do not assert that they regularly drove interstate routes, Defendants argue that the MCA exemption still applies, relying on two circumstances where drivers who primarily make intrastate deliveries can still be subject to the MCA exemption. First, if "interstate travel constitutes a 'natural, integral and inseparable' part" of the duties of the employees so that they are "likely to be called on to perform interstate travel," then the employees are deemed as participating in interstate commerce. *Dauphin*, 544 F. Supp. 2d at 274 (citing *Morris v. McComb,* 332 U.S. 422, 433 (1947)); *see* Defts. Mot. at 16-18. Second, if the goods transported "are involved in a 'practical continuity of movement' in the flow of interstate

commerce," then the employees are also considered to have acted in interstate commerce when delivering the goods. *Bilyou*, 300 F.3d at 223 (quoting *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943)); *see* Defts. Mot. at 14-16.  The Court turns now to each of these arguments.

### 3. Likelihood of Interstate Travel

Defendants assert that interstate travel was a natural, integral, and inseparable part of Dairyland drivers' duties because the drivers "always have the potential of covering an interstate route" as they are "expected to cover other drivers when they call out from their shifts or when they cannot perform their shifts because of their attendance at training."  Defts. 56.1 Stmt. ¶¶ 12-13; *accord* Defts. Mot. 16-18.  Plaintiffs respond that questions of fact preclude applying the MCA exemption on this basis at summary judgment.  *E.g.*, Pls. Opp. & Cross-Mot. at 11-12.

Interstate commerce is a natural, integral, and inseparable part of an employees' duties when interstate trips are "distributed generally throughout the year and their performance [is] shared indiscriminately by the drivers and [is] mingled with the performance of other like driving services rendered by them otherwise than in interstate commerce."  *Morris*, 332 U.S. at 433.  Other factors considered to determine if interstate travel is integral to employees' duties include "an examination of the method by which the employer assigns the interstate activity to the pertinent class of employees, the nature of the employer's business, and perhaps to a lesser degree, the proportion of interstate-to-intra-state employee activity."  *Gutierrez Chacon v. P & S Select Foods, Inc.*, No. 17 Civ. 1037 (ER), 2019 WL 6170423, at *4 (S.D.N.Y. Nov. 19, 2019) (internal quotation marks omitted); *see also Cruz v. AAA Carting & Rubbish Removal, Inc.*, 116 F. Supp. 3d 232, 249 (S.D.N.Y. 2015); *Masson v. Ecolab, Inc.*, No. 04 Civ. 4488 (MBM), 2005 WL 2000133, at *9 (S.D.N.Y. Aug. 17, 2005).

Defendants have not carried their burden to demonstrate the absence of disputed material facts on this theory.  Plaintiffs submitted evidence in the form of declarations from drivers who

were assigned routes that suggests that it was unusual for drivers typically assigned intrastate routes to be assigned interstate routes.  Harriot Decl. ¶¶ 11, 13; Butler Decl. ¶¶ 11, 13.  Both declarants state that, since they began their employment, the "almost never [have] had to venture outside of New York State to make deliveries."  Harriot Decl. ¶ 15, Butler Decl. ¶ 15.  While there were occasions at the onset of the COVID-19 pandemic when each was ordered to drive outside of New York, one described that as "incredibly rare," Butler Decl. ¶ 15, and the other said he could "count on one hand how many times" that occurred, Harriot Decl. ¶ 15.  These same declarants also indicate that there was no random route assignment system; in other words, that interstate routes and intrastate routes were not "shared indiscriminately."  *Morris*, 332 U.S. at 433; *see* Harriot Decl. ¶¶ 11, 13; Butler Decl. ¶¶ 11, 13; Wiley Decl. ¶¶ 12-13.  Defendants admit that drivers "are typically assigned routes," suggesting that such drivers are assigned to deliver on a particular route or in a particular territory, and that this assignment can be purely within New York State.  Defts. Counter 56.1 Stmt. ¶¶ 12-15.

In arguing that these drivers nonetheless faced a likelihood of interstate travel, Defendants point to evidence that only demonstrates that genuine disputes of fact exist.  For instance, they argue that "[t]he undisputed evidence shows that Plaintiffs could reasonably expect[] to substitute for, or cover, any other route if the assigned driver cannot perform the route," citing Gifford's Rule 30(b)(6) deposition testimony.  Defts. Reply at 7 (citing Defts. Counter 56.1 ¶ 13 (citing Dairyland Dep. Tr. at 52:1-12)).  But Gifford's testimony on this front was vague at best:

> Q:   So are there individual delivery drivers who do delivery routes that do not leave the state of New York?
>
> A:   So on a given day, absolutely, over the course of months or years, not necessarily.  The -- we certainly have a number of routes that, you know, go through a specific borough, go through Westchester, go through Long Island.  But over the course of time -- it's a little -- it's similar to what we were talking about earlier with the non-CDL trucks.  When somebody calls out, when somebody's training, when somebody doing a safety ride, when somebody's just covering for somebody else, you know, they -- there's

> potential for, you know, taking a different route that's going to take you
> through Connecticut or take you through New Jersey.

Dairyland Dep. Tr. at 51:18-52:12.  Gifford testified merely that there is "the potential for" drivers

assigned to New York routes to be called to cover interstate routes.  There is no detail on how

often that happened, or if it happened at all beyond just the potential.  In fact, just minutes later in

that same deposition, Gifford testified that his belief that there was a possibility of a driver assigned

to intrastate deliveries also making interstate deliveries was speculation based on his general

assumptions and that he had not seen any documentation verifying that this had in fact occurred.

*Id.* at 58:4-59:12.

Defendants also cite to undisputed portions of their Rule 56.1 statement that roughly half

of the routes driven by Dairyland drivers from 2017 to 2021 were destined for locations outside of

New York State.  Pls. Counter 56.1 Stmt. ¶ 15 (thirty-nine out of ninety-nine routes in 2017); *id.*

¶ 18 (forty-one out of eighty-two routes in 2018); *id.* ¶ 21 (forty-one out of eighty routes in 2019);

*id.* ¶ 24 (forty-five out of eighty-six routes in 2020); *id.* ¶ 27 (forty-five out of eighty-six routes in

2021).  But this does not establish whether these interstate routes were all driven by the same

drivers who had those routes as their regular assignments, or whether the routes were interspersed

indiscriminately and commonly among all of the drivers.  Defendants' evidence therefore falls

short of demonstrating the absence of a genuine dispute over the material fact of how often drivers

typically assigned to New York routes were called on to drive interstate routes and, as a corollary,

to what extent they may therefore have reasonably expected to be called on to drive interstate

routes.  *Cf. Morris*, 332 U.S. at 433 (holding that drivers were engaged in interstate commerce

where 3.65% of the total trips were interstate but 24.4% of the employer's drivers made an

interstate trip each week and throughout the relevant year 95% of the drivers had made at least one

interstate trip).

Nor do the Declarations from Heffelfinger and Gifford demonstrate the absence of a

dispute over material fact about whether drivers were expected to perform interstate routes.  Both Heffelfinger and Gifford observe that "Dairyland drivers are expected to cover other drivers when they are unavailable to drive for their shifts.  This coverage responsibility means that every single one of Dairyland's drivers have the potential of covering an interstate route on a given day." Heffelfinger Decl. ¶ 12; Gifford Decl. ¶ 12.  Gifford attaches what appears to be a job posting for driver position with Dairyland, but missing is any explanation or context for that document. Gifford Decl. ¶ 12, Exh. 1.  The job posting merely indicates the location for the position as "NY, MA" and says that travel is "Local."  *Id.*, Exh. 1.  And the corresponding paragraph in Gifford's Declaration provides no further clarification.  *See id.* ¶ 12.  As presented, this document establishes no facts about Dairyland's actual operations and route assignment.  And in any event, "the name given to the employee's position is not controlling; rather, it is the character of the activities involved in the employee's performance of his job that controls." *Gutierrez Chacon*, 2019 WL 6170423, at *3 (citing *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 707-08 (1947)). Furthermore, the statements in the Declarations from Heffelfinger and Gifford, which post-date Gifford's Rule 30(b)(6) deposition, appear designed to provide certainty lacking from Gifford's deposition testimony.  These Declarations are perilously close to being the sort of self-serving affidavits that are afforded minimal, if any, weight at summary judgment.  *Cf. Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony.").

On the whole, viewing the evidence in the light most favorable to either moving party, there are genuine disputes of fact over how often drivers assigned New York routes were asked to cover interstate routes and, relatedly, whether such drivers reasonably expected to cover interstate routes.  Accordingly, Defendants are not entitled to summary judgment that the MCA exemption

applies based on the argument that interstate travel was a natural, integral, and inseparable part of the duties of Dairyland's drivers, nor are Plaintiffs entitled to summary judgment that the MCA exemption cannot, as a matter of law, apply under this test.

### 4.   Practical Continuity of Movement in Interstate Commerce

Defendants' second argument for applying the MCA exemption to Plaintiffs is that Dairyland and its drivers were engaged in interstate commerce because the goods delivered from the Warehouse were ordered from suppliers outside of New York and the United States, rendering deliveries to customers in New York the final leg of an interstate commercial voyage.  Defts. Mot. at 14-16.  Plaintiffs, on the other hand, argue that the goods shipped to the Warehouse came to rest at the Warehouse and therefore were not subsequently delivered by the drivers as part of an unbroken string of interstate commerce.  Pls. Opp. & Cross-Mot. at 8-10, 14-17.

Employees may be subject to the MCA exemption even if they only make intrastate deliveries when the goods they transport are part of a "practical continuity of movement in the flow of interstate commerce."  *Bilyou*, 300 F.3d at 223 (internal quotation marks omitted) (citing *Walling*, 317 U.S. at 568) (collecting cases).   When applying this rule, courts place a heavy emphasis on the "shipper's fixed and persisting intent at the time of . . . shipment," assessing whether that intent "was to deliver an item to a specified customer who had ordered the item, regardless of whether it was stored temporarily intrastate," or whether it was to deliver an item "to an intrastate location, such as a warehouse, for future delivery to customers yet to be identified." *Cruz*, 116 F. Supp. 3d at 250 (quoting *Masson*, 2005 WL 2000133, at *6).  The latter is indicative of intrastate commerce and the former suggests interstate commerce.  *See id.*  "In other words, the exemption is inapplicable where the final destination of any shipment is not decided until after the goods had come to rest in the warehouse."  *Id.*; *see also Walling*, 317 U.S. at 568 ("[I]f the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their

final destinations, they remain 'in commerce' until they reach those points."); *Raymond*, 2017 WL 1251137, at *4 ("[W]hen determining whether intrastate shippers qualify for the MCA exemption, courts focus on whether the goods' final destination was known at the time they were shipped." (citing *Walling*, 317 U.S. at 568)).   The shipper's intent is assessed as of the "time the transportation commenced."   *Bilyou*, 300 F.3d at 223-24 (quoting *Project Hope v. M/V Ibn Sina*, 250 F.3d 67, 74 (2d Cir. 2001)).   A critical factor in assessing a shipper's intent is whether the goods in question were transported because of a specific customer order.   *See Raymond*, 2017 WL 1251137, at *6 (noting "the Supreme Court's requirement of a 'particularity' of evidence that . . . goods were meant for specific customers" (citing *Walling*, 317 U.S. at 570)); *see also id.* at *7 (same); *Osorio v. Mathews Prime Meats, Inc.*, 101 F. Supp. 3d 255, 260 (E.D.N.Y. 2015) (finding that delivery truck drivers for a seller of meat products only fell within the MCA exemption when delivering products ordered from out of state for delivery to specific customers).

The Department of Labor ("DoL") and the Interstate Commerce Commission ("ICC"), a former federal regulatory agency, have issued guidance on how to determine if a shipper is engaged in interstate commerce; the parties disagree about which guidance applies here.   In 1957, the ICC issued Ex Parte No. MC-48, 71 MCC 17 (1957) ("MC-48"), providing guidance on "when the transportation of petroleum and petroleum products by motor carriers within a single state is interstate commerce."   *Baird v. Wagoner Transp. Co.*, 425 F.2d 407, 410 (6th Cir. 1970) (citing MC-48).   "The criteria used in [MC-48] were incorporated into an interpretive Bulletin of the Wage and Hour Division, United States Department of Labor outlining the scope of the [MCA] exemption to the FLSA."   *Id.*   The interpretive bulletin became part of the Code of Federal Regulations.   *See* 29 C.F.R. § 782.7.   In 1992, a few years prior to its dissolution, the ICC released a policy statement "review[ing] established guidelines for motor carriers and shippers to determine the interstate or intrastate nature of for-hire motor traffic moving from warehouses or similar

facilities to points in the same State after a for-hire movement from another State." Policy Statement, Ex Parte No. MC-207, 8 I.C.C.2d 470, 1992 WL 122949, at *1 (I.C.C. Apr. 27, 1992) ("MC-207").[11] Defendants argue that MC-207 superseded MC-48, while Plaintiffs argue MC-48 still provides relevant guidance. Defts. Reply at 3-4.

MC-207 and MC-48 lay out similar frameworks for determining whether a shipper has a fixed and persisting intent that the goods being transported continue in interstate or foreign commerce, but they differ in how they treat shippers who place orders pursuant to forecasts. The more recent MC-207 enumerates criteria to determine whether certain traffic is interstate or intrastate, identifying the following scenario as a factor indicative of interstate commerce:

> Although the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. The factual basis for projecting customer demand may include, but is not limited to, historic sales in the State, actual present orders, relevant market surveys of need.

MC-207, 1992 WL 122949, at *2. MC-48, meanwhile, states that no fixed and persisting interstate intent exists where:

> (i)    At the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and
>
> (ii)   the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and
>
> (iii)  transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage.

29 C.F.R. § 782.7(b)(2) (emphasis added) (citing MC-48). The first of the three factors in MC-48 suggests that shippers who place orders based on forecasts are not operating in interstate commerce, whereas MC-207 counsels that shippers placing orders based on forecasts that are

---

[11] The statement was based on "Commission, Federal Court and Supreme Court decisions" up to that point. 1992 WL 122949, at *1.

sufficiently grounded in fact can be shipping goods in interstate commerce.

The Court is not aware of any binding authority in this Circuit endorsing one test over the other.  In 2002, the Second Circuit cited 29 C.F.R. § 782.7(b)(2) for the proposition that "intrastate transportation can satisfy the interstate commerce requirement of the MCA if the shipper has a 'fixed and persisting transportation intent beyond the terminal storage point at the time of shipment.'"  *Bilyou*, 300 F.3d at 224.  But more recently, in a non-precedential summary order, the Second Circuit referred to MC-48 as an "outdated" test.  *Kennedy v. Equity Transp. Co., Inc.*, 663 F. App'x 38, 40 (2d Cir. 2016) (citing *Roberts v. Levine*, 921 F.2d 804, 811-12 (8th Cir. 1990)).

In support of its argument that MC-48 should be disregarded, Defendants rely heavily on a January 11, 2005 Opinion Letter (the "2005 Opinion Letter") from the DoL.  The 2005 Opinion Letter was issued in response to a request by a company for guidance on the application of the MCA exemption for drivers transporting various petroleum products.  January 11, 2005 Opinion Letter, "Intra/interstate transportation of gasoline and section 13(b)(1)," FLSA 2005–10, available at https://perma.cc/5GPJ-3UCN.  The letter noted that MC-207 "supplemented" the guidance in 29 U.S.C. § 782.7(b)(2) for the specific situation of "motor traffic moving from warehouses or similar facilities to points in the same State after or preceding a movement from another State." *Id.* (quoting MC-207).  The significance of the 2005 Opinion Letter is minimal at best.  Initially, the letter describes MC-207 as "supplement[ing]" 29 C.F.R. § 782.7(b)(2) (*i.e.*, MC-48), which is different from MC-207 superseding MC-48.  Indeed, 29 C.F.R. § 782.7 remains on the books in the Code of Federal Regulations.  In addition, the field handbook for the Wage and Hour Division of the DoL, which is responsible for enforcing the FLSA, does not mention the 2005 Opinion Letter, yet still cites MC-48's framework.  *See* Dept. of Labor, Field Operations Handbook, Ch. 24 – Transportation Exemptions at 24d02 (published June 15, 2016), available at https://perma.cc/EB9B-X3DP.

In the face of this ambiguous backdrop is what MC-207 itself recognized: "[t]he essential and controlling element in determining whether the traffic is properly characterized as interstate is whether the shipper has a fixed and persisting intent to have the shipment continue in interstate commerce to its ultimate destination." 1992 WL 122949, at *1. Whether that intent is present "is ascertained from all the facts and circumstances surrounding the transportation." *Id.* at *2. And the facts and circumstances material to Dairyland's intent at the time of ordering are in dispute.

Defendants assert that "the undisputed evidence indicates that every item stored at the Warehouse is based on a specific order by a customer and its route is predetermined." Defts. Mot. at 15. But this is contradicted by the testimony from Dairyland's own Rule 30(b)(6) deposition. Gifford first testified that Dairyland's purchases were based on forecasting that considered how fast the particular food spoils and can be kept at the Warehouse, and whether they received a favorable price on the product. Dairyland Dep. Tr. at 72:8-16. Of particular note, in response to a question about whether "all the inventory Dairyland purchases" is based on such forecasting Gifford responded, "Yes. Yes." *Id.* Yet Gifford's testimony later in the same deposition was that not all of the purchasing was based on a forecast, thus creating a genuine issue of fact. Specifically, Gifford testified that Dairyland might buy inventory based on an individual order from a customer under three scenarios: if the order came from "a particularly good customer" that the company "didn't want to say no to," if the order came from "a customer who's committed to buying a large enough amount that it would make sense to order it and hold" the product in the Warehouse, or if the order was for "a product where even if only one customer wanted it we were confident that we could sell it to other customers." *Id.* at 80:7-20. Gifford then agreed that this scenario of directed purchases occurred for the company's "favored customer[s]." *Id.* at 80:21-81:20.

Here too, the statements in the Heffelfinger and Gifford Declarations are insufficient to demonstrate the absence of a disputed material fact and, if anything, create a dispute of fact by

contradicting Gifford's testimony.  According to Heffelfinger, "[m]any of the goods and produce" that are imported to the Warehouse "are earmarked for specific TCW customers."  Heffelfinger Decl. ¶ 7.  Gifford similar states that "[a] very large portion of the goods and produce" imported to the Warehouse "are earmarked for specific TCW customers."  Gifford Decl. ¶ 7.  And Heffelfinger adds that Defendants "use sophisticated projection systems to assess the needs of their customers," with the "[g]oods and products . . . purchased based on these projection systems." Heffelfinger Decl. ¶ 8.  Neither declarant explains what is meant by "earmarked for specific customers," lacking such details as whether the customers had contracts with Dairyland, whether the customers were invoiced for them, or whether the "orders" constituted merely phone conversations.  *Cf. Bilyou*, 300 F.3d at 220, 225 (finding that the defendant had a fixed and persistent intent to ship goods interstate because it received pre-printed invoices from the intended out of state recipient).  And, again, both Declarations do not align squarely with Gifford's prior deposition testimony as Defendants' corporate representative, and therefore are afforded reduced weight as seemingly self-serving affidavits.  *See Trans-Orient Marine Corp.*, 925 F.2d at 572.

The exact nature of the ordering process that precedes shipments to Dairyland's warehouse is therefore in dispute.  This is material as it bears directly on the "intended final destination of shipment," which determines whether transportation "is of an interstate nature."  *Bilyou*, 300 F.3d at 223-24; *see also Raymond*, 2017 WL 1251137, at *6 (noting that "particularity" is required in demonstrating that goods were meant for a specific customer (citing *Walling*, 317 U.S. at 570)).[12]

---

[12] Plaintiffs briefly argue that it is Dairyland's suppliers, rather than Dairyland's, intent that matters for this inquiry.  Pls. Reply at 4-5.  Plaintiffs did not cite any cases supporting this proposition, and courts in this District have focused on the defendant employer's intent.  *See, e.g.*, *Cruz*, 116 F. Supp. 3d at 251 (denying the defendants' motion for summary judgment to allow discovery on the defendants' intent to transport waste out of state); *Masson*, 2005 WL 2000133, at *2 (examining the defendant's intent behind shipping cleaning products to the plaintiffs across state lines to determine the nature of the plaintiffs' subsequent driving activities); *Raymond*, 2017 WL 1251137, at *7 (assessing the defendants' intent).

In addition to relying on the purported nature of their ordering system, Defendants argue that there was a practical continuity of movement because they (i) they owned and operated the Warehouse, (ii) they exercised full control over products at the Warehouse, (iii) they did not modify products at the Warehouse, (iv) they used modern tracking systems to record the goods that pass through the Warehouse, and (v) drivers not only delivered goods to customers but also returned crates to suppliers or picked up goods directly from suppliers.  The first four are factors identified in MC-207 and have been applied by some courts outside this District.  *E.g.*, *Horn v. Digital Cable & Commun., Inc.*, No. 06 Civ. 325, 2008 WL 7137186, at \*3-6 (N.D. Ohio June 12, 2008); *Musarra v. Digital Dish, Inc.*, 454 F. Supp. 2d 692, 711-20 (S.D. Ohio 2006).  The final factor is relevant under Second Circuit law; the Second Circuit has found the "collection and out-of-state export of empty containers," which Defendants suggest is comparable to crates they claim the drivers would pick up, to be conclusive evidence of interstate commerce.  *See Bilyou*, 300 F.3d at 224-25.

While certain evidence supports the presence of some of these factors, the relevant evidence is hardly undisputed.  Gifford's testimony during Defendants' Rule 30(b)(6) deposition establishes that each TCW distribution center—of which the Warehouse is one—has its "own independent . . . inventory tracking system."  Dairyland Dep. Tr. at 45:22-23; *see also id.* at 45:10-20.  But the evidence that Defendants cite to demonstrate that drivers picked up crates and goods from suppliers is vague at best.  *See* Defts. Counter 56.1 Stmt. ¶¶ 7-9.  Specifically, Heffelfinger states in his Declaration that drivers are "often asked" to "return crates[] to suppliers who ship goods to the Bronx warehouse" and that it is "not uncommon for drivers to be asked to drive interstate routes that are outside of their normally scheduled route to pick up products and goods directly from the supplier and bring those goods to the Bronx warehouse."  Heffelfinger Decl. ¶¶ 14-15.  Initially, these statements offer no detail on how often drivers were asked to perform these

duties.  But more problematic, Heffelfinger's statements about drivers picking up goods from

suppliers contradicts Gifford's testimony at the Rule 30(b)(6) deposition, where he explained that

third party vendors would bring orders from suppliers to the Warehouse:

> Q: The only drivers, delivery drivers, that Dairyland would employ would be operating out of the Bronx distribution center; is that right?
>
> A: That's right.
>
> Q: Okay.  When I say "operating," that means they make deliveries from the Bronx distribution center to locations outside the Bronx; right?
>
> A: I mean, they could also make deliveries inside the Bronx as well, but yes.
>
> Q: I'm sorry, no. I mean, like, they don't -- there's none of them that are employed that would go and pick up an order and bring it back to the -- from a supplier and bring it back to the warehouse?
>
> A: No.  There -- there's not.  They -- all of our -- all of our vendors -- deliveries are a third party.
>
> Q: So all goods stored in the Bronx facility -- in the Dairyland facility are brought by individuals or entities that are not employed by Dairyland; correct?
>
> A: That's right.

Dairyland Dep. Tr. at 35:10-36:7.

More fundamentally, though, even if the evidence did establish each of these factors in

Defendants' favor, a genuine dispute of material fact would remain as to the extent that goods were

ordered to the Warehouse based on specific customer orders.  *See Masson*, 2005 WL 2000133, at

*11 (declining to grant summary judgment in favor of defendant asserting the MCA exemption

because it was "disputed . . . whether it was only under extraordinary circumstances . . . that

plaintiffs ordered items for specific customers and then delivered them, or likely that they could

be called upon in the ordinary course of their work to do so" (internal quotation marks and

alteration omitted)).  Thus, viewing the evidence in the light most favorable to either Plaintiffs or

Defendants, there is a genuine dispute of material fact that precludes finding, as a matter of law,

that the MCA exemption either applies or does not apply under a continuity of movement theory.

**B.    The NYLL Wage Notices and Wage Statements Requirements**

As noted, in the Fifth Cause of Action, Plaintiffs allege that Defendants failed to provide wage notices when they were hired in violation of NYLL section 195(1).  Am. Compl. ¶¶ 111-113.  And the Sixth Cause of Action alleges that Defendants have failed to provide Plaintiffs with wage statements in violation of NYLL section 195(3).  *Id.* ¶¶ 114-116.  Defendants argue that Plaintiffs lack constitutional standing to bring both causes of action.  Defts. Mot. at 18-20.

NYLL section 195(1)(a) requires employers to provide, at the time of hiring, wage notices with the following information:

> [T]he rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other;  allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances;  the regular pay day designated by the employer in accordance with section one hundred ninety-one of this article;  the name of the employer;  any "doing business as" names used by the employer;  the physical address of the employer's main office or principal place of business, and a mailing address if different;  the telephone number of the employer; plus such other information as the commissioner deems material and necessary. . . .

NYLL § 195(1)(a).  NYLL section 195(3) requires employers to provide statements with each wage payment.  *Id.* § 195(3).  These wage statements must include, *inter alia*, dates of work covered by the payment of wages, rates of pay, gross wages, deductions, and allowances.  *Id.* § 195(3).  The NYLL further provides that employees may be entitled to specified penalty awards for violations of these provisions.  *Id.* § 198(1-b), (1-d).

Defendants argue that Plaintiffs lack standing for Plaintiffs' claims under NYLL sections 195(1) and 195(3) because they "do not allege any harm that resulted from [these] purported procedural violation[s]."  Defts. Mot. at 19.  To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

A number of judges in this Circuit have concluded that merely a failure to receive a wage notice and wage statements as required under sections 195(1)(a) and 195(3) is not enough to establish Article III standing for such claims.  *E.g.*, *Ramirez v. Urion Constr. LLC*, No. 22 Civ. 3342 (LGS), 2023 WL 3570639, at *8 (S.D.N.Y. May 19, 2023); *Guthrie v. Rainbow Fencing Inc.*, No. 21 Civ. 5929 (KAM), 2023 WL 2206568, at *6 (E.D.N.Y. Feb. 24, 2023); *Neor v. Acacia Network, Inc.*, No. 22 Civ. 4814 (ER), 2023 WL 1797267, at *4 (S.D.N.Y. Feb. 7, 2023); *Shi v. TL & CG Inc.*, No. 19 Civ. 8502 (SN), 2022 WL 2669156, at *9 (S.D.N.Y. July 11, 2022); *Sevilla v. House of Salads One LLC*, No. 20 Civ. 6072 (PKC), 2022 WL 954740, at *7 (E.D.N.Y. Mar. 30, 2022); *Wang v. XBB, Inc.*, No. 18 Civ. 7341 (PKC), 2022 WL 912592, at *13 (E.D.N.Y. Mar. 29, 2022); *Sanchez v. Ms. Wine Shop Inc.*, No. 22 Civ. 2178 (PKC), 2022 WL 17368867, at *9 (E.D.N.Y. Nov. 30, 2022).  Some courts have reasoned that for such an "informational injury"— *i.e.*, not receiving the wage notice or wage statements—to give rise to standing, "the plaintiff must allege 'downstream consequences' from failing to receive that information that show[s] an interest in using the information 'beyond bringing this lawsuit.'"  *Shi*, 2022 WL 2669156, at *2 (quoting *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 444 (2d Cir. 2022)) (brackets omitted); *accord Chen v. Lilis 200 West 57th Corp.*, 19 Civ. 7654 (VEC), 2023 WL 2388728, at *8 (S.D.N.Y. Mar. 7, 2023) ("In the wake of the Supreme Court's decision in *TransUnion*, courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete, downstream consequences of the recordkeeping violation.").

To date, discovery in this case has been "solely related to information concerning the application of the Motor Carrier Act."  Dkt. 96 at 3.  Without discovery taking place beyond the MCA exemption, it would be premature to address whether Plaintiffs can establish "downstream consequences" from the lack of wage notice and wage statements that caused them injury.  *Cf.*

31

*Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) ("Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery.").  The Court therefore denies Defendants' motion to dismiss the Fifth and Sixth Causes of Action without prejudice to Defendants renewing that motion upon the completion of discovery on the issue of Plaintiffs' standing.

**C.   Permission to Move for Collective Certification and Class Action Certification**

Plaintiffs request that the Court permit them to move for collective certification under the FLSA and to seek class certification as to their New York state law claims.  Pls. Opp. & Cross-Mot. at 2.  Plaintiffs devoted no substantive part of their briefing to justify those requests.  But with respect to certain state law claims, there remains the antecedent jurisdiction question of whether Plaintiffs have standing to assert them.  *See supra* III.B.  Thus, before setting a schedule for collective and class action certification briefing, the Court will hear from the parties as to whether such motion practice should proceed at this point or wait until the standing issue is resolved.  Therefore, Plaintiffs' request for leave to move for collective and class certification is denied without prejudice.

**IV.   Conclusion**

For the foregoing reasons, Defendants' motion for partial summary judgment with respect to Plaintiffs' FLSA overtime claims is granted only in favor of Dairyland and as to the following Plaintiffs: Jamie Perez, Jose Sanchez, Alexandro Palalia, Isaac Pyant, Francis Cabrera, Martin Haye, Robert Jimenez Ramos, Ramon Ramos, Alejandro Palalia, and Juan Vasquez.  The Third Cause of Action therefore is dismissed as to those Plaintiffs against Dairyland.   Otherwise, Defendants' motion for partial summary judgment, and Plaintiffs' cross-motion for summary judgment, concerning the MCA exemption are denied without prejudice.  Defendants' motion for summary judgment with respect to Plaintiffs' failure to provide wage notice and wage statements

in violation of the NYLL also is denied without prejudice, as is Plaintiffs' request for leave to move for collective certification under the FLSA and for class certification as to their NYLL claims.

The parties are ordered to appear for a status conference to discuss next steps in this litigation. The status conference will take place in Courtroom 12D of the Daniel Patrick Moynihan U.S. Courthouse, 500 Pearl Street, New York, New York 10007, on October 10, 2023, at 3:30 p.m. The Clerk of Court is respectfully directed to close the motion pending at Docket Number 122.

SO ORDERED.

Dated: September 30, 2023
       New York, New York

_____
                    JOHN P. CRONAN
                United States District Judge